ELIZABETH P. CROCKER, in equity, *vs.* LEWIS PIERCE, Adm'r.

*Trustee—settlement between, and the cestui que trust.*

Where by the terms of a marriage settlement the trustee under it is to change the investment of the trust-funds upon the joint request in writing of the *cestui que trust* and her husband, such written request is essential to relieve the trustee from liability for loss arising from any change of investment made by him.

If, after the determination of the trust by the death of the husband, in an adjustment, between the trustee and the beneficiary, of the matters of the trust, there be, in the property conveyed to her as the consideration of her release to the trustee, an "inadequacy of price, and inequality of advantages in the bargain," equity will set aside the release so obtained and afford relief.

Upon the facts of the present case, that principle applied; an adjustment set aside, and the administrator of the trustee held to account in cash for the trust funds, and interest. APPLETON, C. J., KENT and BARROWS, JJ., dissenting.

BILL IN EQUITY.

Heard on bill, answer and proofs. The complainant, as appears from the statement of facts contained in the opinion, was the beneficiary of trust funds under a marriage settlement, the terms of which, so far as necessary to an understanding of the issue, are stated by the court. Ira Crocker, brother to the complainant's husband, Samuel E. Crocker, succeeded the original trustee, by substitution, and held the trust unsettled after the death of Samuel, and up to the time of his own decease. Ira was appointed trustee Feb. 21, 1853, and died Dec. 20, 1863. Eight thousand dollars of her trust funds Ira invested in the purchase of an estate in Newton, Mass., upon which Samuel and his wife resided, the title thereto being conveyed May 20, 1857, by said Samuel, the former owner, to "Ira Crocker, trustee for Samuel E. Crocker and wife," so that, upon the death of Samuel, the title was not available to the complainant absolutely and in her own right, as it should have been, according to the marriage settlement. Samuel E. Crocker died in September, 1860, and Ira was appointed administrator of his estate and received all his papers from the widow, who, in the fall of that year, went to visit her friends in South Carolina, and was detained there by the outbreak and continuance of hostilities till June 8, 1835, when she returned to Newton. She says she received two letters from Ira Crocker while she was in the South, but both were destroyed by the sack of her sister's house in Columbia, S. C., by the soldiers of Gen. Sherman's army. Soon after coming North she received a letter from Ira C. Kimball, of Bethel, Me., saying he had some papers of importance to her, formerly left with Ira Crocker; that there was business needing her immediate attention, and requesting her to come to Portland to see him about it. Subsequently he wrote her that his health would preclude him from going to Portland, but said he had sent his papers to his counsel, Edward Fox, Esq., who would act for him. Kimball was administrator of the estate of Ira Crocker, though this fact was not stated in his letters to Mrs. E. P. Crocker, nor did he intimate the nature of the papers or the business to which he invited her atten-

tion; but she alleged in her bill that she supposed it referred to the title-deeds of her house in Newton, which it had become necessary, or desirable, for her to sell; hence, she was anxious to have a clear understanding of the title, and to have the papers relative thereto in her possession.   Wishing also to confer with Kimball, whom she understood to be executor of Ira Crocker, relative to her trust funds, immediately upon the receipt of his second letter, she proceeded directly to Bethel, without stopping at Portland. Inquiring for her house papers, she was told they had been sent to Mr. Fox.   Asking about her money, she says Kimball told her, shortly, that it was put into a slate quarry, at Brownville, Maine, which, she says, was the first she  ever  knew of such a disposition of her property, although she knew her husband had been engaged in such a speculation, and that it was not a suitable place for her funds.   She says she expressed her surprise and dissatisfaction, but got no further information from Kimball.   Arriving in Portland, she called upon Mr. Fox.   As to this interview, her recollection differed from his; but it is agreed that, owing to the absence of requisite papers, it became necessary to appoint another meeting; so it was arranged that he should meet her at the United States Hotel, Boston, with whatever was required, on the 17th of July, 1865.   She met him, according to agreement, but there was a discrepancy as to what occurred there, beyond the fact that she did sign the receipt and release, fully set out in the opinion, discharging all claim against the estate of Ira Crocker in consideration of receiving her husband's note secured by 3000 shares of slate stock, pledged as collateral, being the property in which her trustee had invested nine thousand dollars of her funds.   It was contended that she knew and approved of this disposal of her money at the time the note was given.   And Mr. Fox testified that the matter was fully explained to her when she signed the release; but she said she had taken no counsel; thought of nothing but the house matter; did not read the document she signed, and knew nothing of its purport or effect, but supposed it connected with the house transaction, and that any explanation of it made to her did not

Crocker v. Pierce.

reach her understanding. The testimony upon both sides was voluminous concerning the circumstances and value of the stock purchased, and whether or not Ira Crocker considered it Mrs. Crocker's absolute property, or whether he recognized his continuing liability to her for the $9000 used in this purchase. Ira C. Kimball having died, Lewis Pierce appears as administrator *de bonis non*, and defends this action.

*P. Barnes*, for complainant.

Law regards marriage settlements as under its protection, to be strictly enforced. Peachy on Mar. Sett. 592; 2 Kent's Com. 173; Atherly on Mar. Sett. 174.

Its terms cannot be changed by her consent while a *feme covert*. *Richards* v. *Chambers*, 10 Vesey, 580.

They are strictly construed. *McDonald* v. *Hesihigg*, 15 Eng. L. and Eq. 587; *Neves* v. *Scott*, 9 How. 196; *Wormley* v. *Wormley*, 8 Wheat. 421; *Greenwood* v. *Wakefield*, 1 Beavan, 576; *Kellaway* v. *Johnson*, 5 Beavan, 319; *Hughes* v. *Wills*, 9 Hare, 749; *Cooke* v. *LaMotte*, 15 Beavan, 239; *Mara* v. *Manning*, 2 Jones v. LaTouche, 311; *Wilkinson* v. *Stafford*, 1 Vesey, jr., 41; 11 Foster (N. Y.), 352, and other cases.

*Pierce pro se*, and *S. C. Strout*, for defendant.

CUTTING, J. It appears that Elizabeth P. Chisholm, on the 6th day of June, 1849, then single and a resident of Charleston, in the State of South Carolina, being possessed in her own right of interest-bearing bonds to the amount of eighteen thousand dollars, in contemplation of marriage with Samuel E. Crocker, conveyed her bonds to one James M. Wilson, to be held in trust for herself and contemplated husband.

In that marriage settlement was the following provision, viz.: " And it is further agreed, that in case the said Elizabeth and the said Samuel shall at any time hereafter, during their joint lives, or the said Samuel, according to the respective estates hereinbefore limited to them, think it beneficial to their or his interest to have

the aforesaid bonds, or any or either of them, sold, disposed of, invested in, or exchanged for other property, real or personal, and the sale money invested in any other property whatever, or placed at interest, that then the said James M. Wilson, on being thereto requested in writing, by the said Elizabeth and Samuel, jointly, or the said Samuel, survivor, shall sell, dispose of, transfer, invest, or exchange the same or any part thereof, as the case may be, and invest the purchase money in such other property, real or personal, or vest it at interest, as may be required by them, the said Elizabeth and Samuel, jointly, or by the said Samuel, survivor. And such purchased, or exchanged, or substituted property, or invested funds, stocks, or choses in, action, shall be held by the said Wilson, trustee, his heirs, etc., subject to the same uses and trusts as are hereinbefore limited and declared, and to and for no others."

Subsequently, the marriage was consummated, and Mr. Wilson executed the duties of trustee until Feb. 21, 1853, when he resigned his trust under the deed of the marriage settlement, and on the same day Ira Crocker, of Portland, was appointed, and under his hand and seal accepted the trust " under the settlement and appointment." So that Ira, the brother of Samuel E. Crocker, was substituted to all intents and purposes for, and took the place of, the original trustee. And having received the funds of the wife, the first inquiry is, has he performed his duty in their subsequent investment?

It is unnecessary to trace the history of the investment, at present, until we come down to May 20, 1858, when from the exhibits the following note of that date appears:

" For value received, I promise to pay Ira Crocker, trustee, or order, nine thousand dollars on demand, with interest.

S. E. Crocker."

" Left as collateral security for the above note, three thousand shares of the stock of the Bangor and Piscataquis Slate Company, which stand in the name of Ira Crocker, trustee."

Here, then, appears to be an investment of nine thousand dollars,

without "the written consent" of the *cestui que trust*, and in violation of the trust deed. But it is contended that she was cognizant of the transaction, and verbally, or by her silence, waived her remedy. Such evidence, if admissible, must be accompanied with the trustee's assurances to her, that the investment was safe, and that he would guarantee it, or words to that effect.

Subsequently, Samuel E. Crocker, deceased, as also Ira Crocker, the trustee, whose estate was administered by Mr. Ira C. Kimball, executor.

In the meantime, certain controversies had arisen in relation to certain real estate in the town of Newton, Mass., which had been purchased with the trust funds, and it seems that Mr. Kimball referred the settlement of the plaintiff's claim against the estate to his counsel in Portland, and it is contended that the same was settled and discharged, and for proof her receipt is produced, dated July 17, 1865, which reads as follows:

"Received of Ira C. Kimball, executor and trustee under the last will and testament of Ira Crocker, late of Portland, deceased, and trustee by substitution in place of James M. Wilson, under a marriage settlement entered into on the 6th day of June, 1849, between the subscriber and Samuel E. Crocker, deceased, a release to me of all said Ira Crocker's interest as trustee in and to the real estate and household furniture at Newton Corner, conveyed by S. E. Crocker to Ira Crocker, in trust, May 20, 1857; also, a note of S. E. Crocker to Ira Crocker, as trustee, for nine thousand dollars, dated May 20, 1858, with three thousand shares in slate quarry, as collateral security for payment of said note; the same being received in full release and satisfaction of all claims or demands in my behalf, against said Ira Crocker's estate, for all money or property received by said Ira Crocker, as trustee under , and by virtue of said marriage settlement, and for his management and disposal thereof.                    E. P. CROCKER. [L. S.]"

This release, if understandingly executed, would operate to bar the plaintiff of all claim in law and equity against the estate of Ira

Crocker. Was it so made and executed? To prove the contrary, the burden is on the plaintiff; and it is no light matter to plead ignorance of the contents, force, and effect of an instrument of so high a nature; but, notwithstanding, this she attempts to do, and with how much success remains to be seen.

The plaintiff substantially testifies, that, after she returned to Newton from the South, in 1865, she found her real estate there, and other property, which had been purchased with her trust funds, to be in the name of Ira Crocker, trustee; and being desirous of obtaining the record title in her own name, had correspondence with the executor of Ira Crocker's estate, who referred her to his counsel in Portland, who would have all the papers in his possession relating to the trust property in Newton, and would, if necessary, transfer to her the title; that thereupon, and in pursuance thereof, she repaired to the place appointed; that her title to the Newton estate was confirmed, and her discharge before stated was executed by her, without her knowledge of its more comprehensive contents, as relates to the nine thousand dollar note and the collateral security; that she read the discharge, or that it was read to her, the preponderance of the evidence is clearly in the affirmative, but whether she understood its import and meaning may be more doubtful. Her statement to the contrary is against the legal presumption. But, considering the nature of the relations between the parties, is not that presumption overcome? We speak now as to her knowledge of the value of the transferred security.

We have already seen that before the discharge, the estate of Ira Crocker was legally responsible to her for the nine thousand dollars. Was the note of her husband, with what is termed the collateral security, an equivalent? and as such did she receive it? If so, was it an equivalent? This leads us to the last inquiry which is as to the security.

It seems that Samuel E. Crocker, some time previously, had purchased one or two hundred acres of land, in the town of Brownville, in Piscataquis county, for what consideration it does not appear. Upon that tract was supposed to be a valuable slate quarry.

It was divided into eight thousand shares, estimated at twenty-five dollars per share, amounting to two hundred thousand dollars as the capital stock, which have been afloat in the market at some price ever since. The quarry has been operated at times, but with no particular income to the proprietors at large. It may embody "the human form divine," but no Michael Angelo has as yet appeared to uncover or disclose it.

Now, what was the consideration of the release? First, the note of Samuel E. Crocker, who was then deceased, and his estate rendered insolvent by his brother, Ira Crocker, but subsequently the debts against the estate were paid by each creditor receiving stock at its par value. It was that or nothing.

The three thousand shares at the time of the alleged transfer had been assessed to pay a debt to Ira Crocker, at two dollars and fifty cents per share. The reversionary interest was subsequently sold for two dollars for the taxes, at public auction—for only the taxes and expenses. This shows that the stock, both by the public and the parties concerned, was considered only of nominal value.

Here, then, assuming the discharge to have been executed as alleged, the facts show "inadequacy of price and inequality of advantages in the bargain," in which event equity affords relief.

> *Judgment for plaintiff for nine thousand dollars and interest on that sum from December 1, 1860, and costs. Decreed accordingly.*

WALTON, DANFORTH, DICKERSON, and TAPLEY, JJ., concurred.

APPLETON, C. J.; KENT and BARROWS, JJ., did not concur.

BARROWS, J., dissenting. I agree in holding that Ira Crocker, not having taken the precaution to fortify himself with the written request of this plaintiff and her husband to invest a portion of the trust fund in the note of the husband, secured by the mortgage of the slate stock, was responsible for the goodness of the investment.

But I do not see how we can, with propriety, set aside the settlement and release, which I cannot doubt were deliberately and understandingly made by the plaintiff after her coverture had ceased—she at the time being aware of the uncertain character of the slate stock which she was receiving.

I concur with Judge Cutting in holding that "this release, if understandingly executed, would operate to bar the plaintiff of all claim in law and equity against the estate of Ira Crocker."

And it seems to me that the uncontradicted testimony on page 45 of the report, given by the honorable counsel who conducted this settlement on the part of Ira Crocker's executor, establishes the fact that it was so executed. How can the remark made by the plaintiff to the counsel of the executor in the progress of the negotiation, that she " ought to have had the whole quarry instead of a part of it," etc., be interpreted except upon the hypothesis that she understood the character of the adjustment she was making, and that she had doubts about the value of the security she was receiving?

But there is another and distinct view of this matter, which seems to me entirely conclusive.

I cannot but put some faith in the estimate placed by the plaintiff's witness, Charles B. Abbott, upon the actual value of the stock at the time of that settlement. See his answer on page 30 of the report. " My judgment is that the shares in the B. & P. Slate Co., in the summer of 1865" (which was the time of the settlement), " were then worth the original $12.50 per share, and the assessment."

Can this plaintiff be allowed to take a stock, which, at the appraisal of her own witness, was, at the time she took it, worth much more than enough to pay her claim, and then, when she has allowed it to be sacrificed by her own improvidence, again have recourse to the estate of her deceased trustee, from which she received it in full satisfaction and discharge of all claims against him as such trustee ?

She ought, at least, to return the stock, if she would rescind the contract of adjustment and release.

It does not seem to me that " the inadequacy of price, or the inequality of advantages in the bargain," is made out, but only that this plaintiff was so unfortunate as to allow her stock to be thrown away after she had received it in discharge of her claim against the trustee's estate.

In this dissenting opinion of BARROWS, J., APPLETON, C. J., and KENT, J., concur.